UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| DAVID E. RIEDESEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:11-CV-30 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

Plaintiff David E. Riedesel filed applications for disability insurance benefits and for supplemental security income[1] on January 16 and January 20, 2009, respectively, with an alleged onset date of September 17, 2007. (Tr. 131-37, 138-47). After plaintiff's applications were denied on initial consideration (Tr. 103-07), he requested a hearing from an Administrative Law Judge (ALJ) (Tr. 111-12).

Plaintiff and counsel appeared for a hearing on October 13, 2009. (Tr. 60-97). The ALJ issued a decision denying plaintiff's claims on November 13, 2009, and the Appeals Council denied plaintiff's request for review on February 16, 2011. (Tr. 21-36; 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

---

[1]Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, respectively.

## A. Hearing Testimony

At the time of the hearing, plaintiff was 48 years old and lived with his wife and two children, aged 18 and 12. He had completed high school and he had an associate's degree in accounting. (Tr. 67-68).

Plaintiff was last employed as a utility worker on a General Mills production line. He testified that he was placed on a corrective action plan after a supervisor expressed concern regarding his ability to operate a forklift. On another occasion, he threatened to "fix" a piece of equipment with a sledge hammer when he was assigned to a job over his objection. Plaintiff left his employment in September 2007. He returned briefly as a cleaner in August 2008, but left because he was unable to tolerate the smell of soybeans.

Plaintiff told the ALJ that he is disabled due to mental and physical problems.[2] (Tr. 69-70). His physical problems include irritable bowel syndrome (IBS), which causes diarrhea and severe cramping in his stomach and left side. He described the pain as "burning, like if somebody's . . . grabbed my colon and kind of clamped it off." He rated the pain at level 9 on a 10-point scale. The episodes occur about once a week and often last for three or four days. In the midst of an episode, he may be confined to the bathroom for three hours in an eight-hour day. He takes Metamucil and Pregabalin, which he stated helps his symptoms only some of the time. He also has dietary restrictions, which he stated he follows. His medication can make him sleepy.

---

[2]The Disability Report completed on January 20, 2009, lists plaintiff's disabling conditions as depression, anxiety, diabetes, IBS, and OCD. (Tr. 178).

Plaintiff also has diabetes. Although he uses an insulin pump, his blood sugar levels vary widely. He experiences elevated blood sugars about three times a week and becomes "real hyperactive." (Tr. 86-87). Following these episodes, he gets very tired. He also experiences episodes of decreased blood sugar when his hands become shaky and his vision "starts to close down." (Tr. 88). Plaintiff has peripheral neuropathy in his hands and feet and arthritic changes in his left arm as a result of an elbow fracture and subsequent surgery.

Plaintiff testified that in 1999 he was diagnosed with depression, anxiety, and obsessive-compulsive disorder. He was hospitalized five times between 1999 and 2007. The most recent hospitalization occurred when his wife noticed that he was not taking all his medication because he wanted to kill himself. His psychological conditions interfere with his ability to work in that he becomes upset if his belongings are touched or are not where he expects to find them. He also has some short-term memory loss. Plaintiff has difficulty sleeping at night and takes naps about three times a week. He is seen for therapy and medication once a month.

Plaintiff's typical daily activities include transporting his children to and from school, doing some housework, checking the computer, taking a walk, riding his bicycle, and grocery shopping. He denied having any difficulty completing household chores. His diabetes causes cramping and numbness in his legs if he stands or sits for more than an hour. He does not have any difficulty lifting or carrying. He attends church, but finds it difficult to sit through a service. He attends his children's in-town sports activities. Although he has friends, he said that he does not see them or talk on the phone with them.

Michelle Peters-Pagella, M.S., testified as a vocational expert about the employment opportunities for an individual of plaintiff's age, with his education, training and work experience; who has no exertional limitations; who can understand, remember, and carry out no more than unskilled work with occasional interaction with supervisors, co-workers, and the general public. She opined that such an individual could return to plaintiff's past work as a general laborer and production line worker. (Tr. 94-95). The ALJ next asked the vocational expert to assume that the individual had marked limitations in the ability to make judgments on complex work-related decisions, the ability to interact appropriately with supervisors and co-workers, and the ability to respond appropriately to usual work situations and to changes in a routine work setting.[3] Ms. Peters-Pagella opined that such restrictions would preclude employment. Id.

## B. Additional Evidence

The record contains reports completed by plaintiff, his sister Elizabeth Harsell, and his mother, Gertrude Riedesel. In a Function Report dated January 26, 2009, plaintiff indicated that he does laundry, prepares two meals a day, keeps the car clean, and does grocery shopping. He can walk for two miles before he needs to rest. He can manage a check book and pay bills. He is ability to handle stress is "not bad -- it matters what is causing the stress." He does not like change. When he is in pain, however, all movement is affected and his ability to concentrate is impaired. When he is depressed, he only wants to sleep. (Tr. 198-208). In a report completed on March 6, 2009, plaintiff stated he wanted to sleep most days and did not shower or shave.

---

[3]These restrictions reflect those indicated by Carol Greening, RN, in a Medical Source Statement completed on March 31, 2009. (Tr. 515-17).

(Tr. 243). Ms. Harsell stated in her report that she had observed plaintiff bent over in pain. (Tr. 260-62). Mrs. Riedesel stated that plaintiff's face turns white and he holds a pillow to his side. She stated that when plaintiff is in pain, he walks as little as possible and in a bent-over fashion. He withdraws in response to depression and/or pain and neglects his hygiene and diet which, in turn, is detrimental to his diabetes. He does not want to listen to others and forgets things easily. He once "hit [her] and knocked [her] across the room." (Tr. 263-66).

### III. Medical Evidence

#### A. Plaintiff's Physical Ailments

The administrative record contains treatment notes dated from October 2006 through December 2009. Plaintiff's principal medical providers during this period were George Kerkemeyer, M.D., his family physician; Purvi Parikh, M.D., his diabetes care provider; Carol Greening, R.N., his mental health provider; and Michelle Friedersdorf, D.P.M., who provided diabetic foot care. Plaintiff received chiropractic care from Larry Anderson, D.C., on a number of occasions. In addition, plaintiff occasionally received care at the Hannibal Clinic Ambulatory Center and specialists.

Plaintiff had an annual checkup with Dr. Kerkemeyer on November 9, 2006. (Tr. 390-91). Plaintiff reported that he had a psychiatric hospitalization from July 31 through August 4, 2006, following which his medications were changed. Dr. Kerkemeyer noted that plaintiff's gastroesophageal reflux symptoms were controlled with medication and his blood pressure was "fine." He was tolerating his medications and had no questions or concerns. Plaintiff was described as alert, coherent, and conversive. This treatment note makes no reference to IBS.

In January 2007, Dr. Kerkemeyer referred plaintiff to Brett D. Hosley, D.O., for consultation regarding tingling and numbness in his left hand and forearm. (Tr. 394, 377-87). On examination, Dr. Hosley noted that plaintiff sometimes displayed "an elevated threshold to pinprick, touch, or temperature testing" on the left hand as compared to the right, but at other times did not describe any abnormalities. A nerve conduction study (Tr. 377-79) was abnormal and showed evidence of possible left ulnar compressive neuropathy and left carpal tunnel neuropathy superimposed over a baseline polyneuropathy; there was also some compressive neuropathy noted around the left knee. Plaintiff's symptoms were unchanged on February 7, 2007, when Dr. Hosley diagnosed "questionable diffuse sensory motor polyneuropathy" likely related to plaintiff's diabetes.[4] There was nothing to be done from a neurologic standpoint. (Tr. 385-87).

Plaintiff had regular office visits with Dr. Parikh for treatment of his diabetes,[5] which she classified as Type II or "MODY." (Tr. 406-07). Plaintiff's blood-sugar logs and insulin pump data consistently indicated poor glycemic control, with his blood sugar levels generally elevated and rarely showing hypoglycemia. (See, e.g., Tr. 418; 426; 429 (high blood sugars noted) and 435 (noting only one low blood sugar

---

[4]Dr. Hosley referred to plaintiff's "questionable left ulnar nerve compression symptoms. The Court agrees with plaintiff the ALJ erred when she interpreted this statement as an indication that his physicians thought he was malingering. (Tr. 27). This error is harmless, however, because the ALJ's credibility determination is otherwise supported by a proper analysis.

[5]Plaintiff had office visits with Dr. Parikh on Nov. 8, 2006; Aug. 2, 2007; Nov. 15, 2007; Jan. 2, 2008; Mar. 18, 2008; Apr. 24, 2008; July 31, 2008; Oct. 16, 2008; Jan. 2, 2009; Mar. 26, 2009; and Sept. 30, 2009. He made a call on Jan. 8, 2008, for new settings for his insulin pump to accommodate working a night shift. The pump was recalibrated again on Nov. 6, 2008. (Tr. 388-89, 406-07, 418, 426, 429-30, 432, 434-36, 438-39, 442-44, 446-57, 499-501, 605-06).

reading), 442 (noting "very few hypoglycemic episodes")). Dr. Parikh consistently discussed with plaintiff the need for him to control his caloric intake, reduce his weight, and exercise more. Plaintiff acknowledged that he was not meeting these expectations, especially during times when he was not working. Despite the erratic glycemic control, Dr. Parikh's review of systems with plaintiff was routinely negative, with plaintiff denying shortness of breath, headaches, palpitations, chest heaviness, abdominal pain, edema, or pain and tingling in the legs.

In April 2007, plaintiff sought treatment at the Hannibal Clinic for abdominal pain and loose stools. He was placed on antibiotics. (Tr. 470). He continued to complain of nausea and diarrhea in May and July 2007. (Tr. 463-64, 469). Radiologic studies completed on July 30, 2007, disclosed no bowel distension and no abnormalities of the liver, spleen, adrenals, kidneys, pancreas or bladder. (Tr. 448-49). On August 15, 2007, plaintiff returned to the Hannibal Clinic where he was seen by John E. Emmons, D.O. Plaintiff reported that he had seen a gastroenterologist the previous day and had been released to work without restrictions. Dr. Emmons contacted the gastroenterologist who stated that he believed plaintiff was suffering from neuropathic pain and recommended starting plaintiff on Tramadol and Nortriptyline. Dr. Emmons gave plaintiff an excuse for the remainder of the work week. When plaintiff returned to the ambulatory clinic on August 21, 2007, however, Dr. Emmons, noted that plaintiff displayed no tenderness, grimacing, guarding or evidence of discomfort on palpation. He included "possible malingering" in his assessment, along with "possible neuropathic abdominal pain by history." (Tr. 460-61). The next day, plaintiff told Dr. Kerkemeyer that he had not had any nausea or vomiting, but complained of sharp pain and constipation. (Tr. 408-09). On September 7, 2007, plaintiff told Dr. Kerkemeyer that

the abdominal condition had "essentially resolved." Dr. Kerkemeyer released plaintiff to return to work. (Tr. 412).

On September 13, 2007, within days of returning to work, plaintiff returned to Dr. Kerkemeyer's office with complaints of dizziness. (Tr. 413). He stopped going to work after a second episode. On September 19, 2007, plaintiff was seen by Kevin B. Imhof, D.O., for further evaluation. (Tr. 414-15). Dr. Imhof diagnosed benign paroxysmal vertigo and prescribed home exercises. On October 24, 2007, Dr. Anderson, plaintiff's chiropractor, gave plaintiff a note excusing him from work between October 6 and October 26, 2007, while plaintiff was receiving treatment for vertigo. (Tr. 322). On November 9, 2007, plaintiff told Dr. Kerkemeyer that the abdominal pain and dizziness were improving; however, he was still not working. (Tr. 416). On December 21, 2007, plaintiff reported to Dr. Kerkemeyer that the dizziness was gone. He requested two letters for work -- one to excuse his absence and the other to clear him to return. (Tr. 422-23).

Plaintiff experienced a resurgence in IBS-symptoms in January 2008. (Tr. 424-25). Dr. Kerkemeyer discontinued Gabapentin, which caused sleepiness, and prescribed Pregabalin in its stead. Two weeks later, plaintiff reported that he was "doing pretty good actually [and] feeling fine." (Tr. 427-28). His bowel function was good and he was not troubled by drowsiness. Plaintiff's IBS symptoms were stable and well controlled on follow-up in March and August 2008 and February 2009. (Tr. 433, 440, 495). His blood sugars continued to be poorly controlled during that time. (Tr. 432, 434-36, 438-39, 442-43, 446-47, 499-501).

In October 2009, plaintiff complained of burning pain in both feet. (Tr. 607). Dr. Friedsdorf prescribed Lyrica for treatment of diabetic foot neuropathy and referred plaintiff to physical therapy, where he made good progress. (Tr. 608, 609).

## B.    Plaintiff's Psychiatric Ailments

The medical records refer to a hospitalization at the Woodland Center from July 31 through August 4, 2006. (See Tr. 390). Following his discharge, plaintiff saw Carol Greening, R.N., for medication review and treatment of obsessive-compulsive disorder. On September 27, 2006, Ms. Greening noted that plaintiff had no suicidal ideation, hallucinations, or delusions. She described plaintiff as alert and appropriately oriented, with clear and logical thoughts. His mood was stable and his affect was appropriate. His insight and judgment were good, as were his memory, concentration and attention. Plaintiff's psychiatric medications were Zoloft and Librium. (Tr. 345).

Ms. Greening's assessment of plaintiff's condition was unchanged at follow-up appointments in December 2006 and March 2007. (Tr. 344, 343). Plaintiff sought an additional appointment on May 10, 2007, reporting that he had had three "occurrences this month at work" and was feeling mildly paranoid. He also reported an increase in anxiety-related diarrhea and wondered whether he needed to change jobs. Plaintiff successfully "processed [the] incident" with Ms. Greening that day. (Tr. 342). He was seen again on an emergency basis on May 14, 2007. (See Tr. 341). By the time of his regularly scheduled appointment on June 11, 2007, however, plaintiff's mood was stable and he was feeling more hopeful. He reported that he was "no longer at [the] job but still working for [the] company." Id. Once again, Ms. Greening described plaintiff as alert and oriented, with appropriate affect and goal-oriented speech. His

memory, concentration and attention were all good and there was no evidence of a thought disorder, hallucinations, delusions, or suicidal ideation.

Plaintiff continued to see Ms. Greening at three-month intervals through December 2008, with no changes in her assessment of his mental status. (See Tr. 335-40). Between January and September 2009, plaintiff saw Ms. Greening once a month. (Tr. 334, 490-91, 506-09, 518, 522). During this period, Ms. Greening described plaintiff as either stable or coping, despite a number of stressors, including loss of employment, marital conflict, and financial hardship.

On February 18, 2009, Paul Stuve, Ph.D., completed a Psychiatric Review Technique form. (Tr. 474-84). Dr. Stuve noted that plaintiff was diagnosed with obsessive-compulsive disorder but opined that plaintiff's disorder was not severe. He noted that treatment notes for the prior 18 months indicated that plaintiff had "no depressive symptoms" and that his condition was stable and his mental status was intact. As Dr. Stuve noted, in his self-completed Function Report, plaintiff indicated that he gets along adequately with others and can follow directions.

Ms. Greening completed a Medical Source Statement on March 31, 2009. (Tr. 515-17). She rated plaintiff as mildly impaired in his abilities to understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions. She described him as moderately impaired in his abilities to understand, remember and carry out complex instructions; and interact appropriately with the public; and as markedly impaired in his abilities to make judgments on complex work-related decisions; interact appropriately with supervisors; and respond appropriately to usual work settings and changes in a routine work setting.

-10-

In the narrative portions of her statement, Ms. Greening noted that plaintiff's history included several mental health hospitalizations. He had significant obsessive-compulsive disorder symptoms and his anxiety interfered with his ability to understand, remember and carry out instructions. She stated that plaintiff had been unable to make safe decisions and had difficulty following directions at work. He had corrective action plans but continued to make mistakes and was deemed unfit to work. She noted that his symptoms had stabilized, but she attributed this to his being unemployed for more than a year and not having to deal with work-related stress. On July 30, 2009, Ms. Greening added the following notation to her statement: "[Plaintiff] will always experience mental health issues. In combination with his medical problems, I feel he is disabled and unable to work at this."

## IV. The ALJ's Decision

In the decision issued on November 23, 2009, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012.

2. Plaintiff has not engaged in substantial gainful activity since September 17, 2007, the alleged date of onset.

3. Plaintiff has the following severe impairments: anxiety and obsessive-compulsive disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can understand, carry out, and remember unskilled work with occasional interaction with supervisors and the general public.

6. Plaintiff is able to perform his past relevant work as a general laborer and production-line worker.

7.    Plaintiff has not been under a disability, as defined in the Social Security Act, from September 17, 2007, through the date of the decision.

(Tr. 26-32).

## V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  Nimick v. Secretary of Health and Human Serv., 887 F.2d 864, 868 (8th Cir. 1989).  The ALJ first determines whether the claimant is engaged in substantial gainful activity.  If the claimant is so engaged, he is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled

-12-

under the Act.  Fourth, the ALJ determines whether the claimant can perform his past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ improperly (1) found that plaintiff's diabetes is not severe; (2) failed to take into account plaintiff's physical ailments when determining his residual functional capacity (RFC); (3) discounted the opinions of plaintiff's mental health provider and chiropractor; (4) discounted the opinions of plaintiff's sister and

-13-

mother; and (5) discounted plaintiff's allegations of disabling symptoms as not credible. Points 4 and 5 will be considered together.

### 1.    The ALJ's Findings Regarding Plaintiff's Diabetes

Plaintiff challenges the ALJ's determination that his Type II diabetes was not a severe impairment. A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citations omitted); 20 C.F.R. § 404.1520(c).

Plaintiff first challenges the ALJ's finding that plaintiff's insulin pump provided "adequate control" of his blood sugar. As plaintiff correctly notes, with the exception of a two-day period in November 2006, he consistently had poor glycemic control and elevated blood-sugar levels that were of concern to his physicians. Plaintiff takes further issue with the ALJ statement that plaintiff's "poor diet and . . . lack of exercise, in contravention of . . . medical advice," undermined the effectiveness of his treatment. (Tr. 27). Plaintiff suggests that the ALJ has overstated the importance of a comment Dr. Parikh made in March 2009: "ASSESSMENT: 48-YEAR-OLD DIABETIC WITH POOR GLYCEMIC CONTROL. THE ISSUE SEEMS TO BE DIETARY NONCOMPLIANCE AND LACK OF EXERCISE." (Tr. 500 (emphasis in original)). A review of Dr. Parikh's treatment notes indicates that she routinely discussed with plaintiff the need to eat fewer carbohydrates, lose weight, and exercise. Furthermore, plaintiff routinely acknowledged that he was failing to meet expectations in this regard. Thus, the record supports the ALJ's finding that plaintiff was noncompliant with important aspects of his diabetes care. To his credit, however, plaintiff was very consistent in keeping medical

-14-

appointments.  In addition, he communicated with Dr. Parikh's office regarding schedule changes that were likely to affect his insulin needs.  (Tr. 426).

The ALJ's significant finding was that plaintiff's diabetes did not cause functional limitations.  This finding is supported by substantial evidence.  Physical examinations by Drs. Kerkemeyer, Patikh and Friedersdorf showed, at most, minimal sensory abnormalities in plaintiff's hands and feet due to neuropathy.  Plaintiff routinely demonstrated a normal gait and was able to toe-and-heel walk, hop on each foot, and squat and rise without assistance.  In January 2007, plaintiff was evaluated for possible neuropathies in his left arm; on examination, he had full muscle strength and sensation within normal limits.  In July and August 2007, plaintiff experienced headaches and abdominal pain that were possibly attributable to neuralgia, but these conditions resolved with treatment.  In late 2009, plaintiff experienced burning pain in both feet, which Dr. Friedersorf attributed to neuropathy and plantar's fasciitis.  This condition also responded to treatment with prescription medicine and physical therapy.  "Impairments that are controllable or amenable to treatment do not support a finding of disability."  Davidson v. Astrue, 587 F.3d 838 (8th Cir. 2009) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997)).  Plaintiff's first claim for relief is denied.

## 2.    The ALJ's RFC Determination

The ALJ determined that plaintiff has the RFC to perform a full range of work at all exertional levels with limitations based solely upon his mental health conditions. Plaintiff asserts that the ALJ erred in failing to include any functional limitations based on his diabetes, IBS, and vertigo.  As discussed above, the record supports the ALJ's determination that plaintiff's diabetes is not a severe impairment and does not create functional limitations.

"RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

The ALJ found that plaintiff's IBS and vertigo symptoms did not last at least 12 months. (Tr. 29). As plaintiff acknowledges in his brief, his IBS symptoms were first documented in July 2007 and were last noted in January 2008, when the condition was successfully managed with medication. Plaintiff's contention that he continues to have significant impairment from IBS is not reflected in his medical providers' treatment notes. (See Tr. 427, 430, 433, 439, 440, 495, 605). Plaintiff's vertigo was similarly short-lived, manifesting between September and December 2007, and there is no indication that this condition will recur.

Plaintiff correctly notes that the ALJ is required to consider limitations and restrictions imposed by all of his impairments, including those that are not "severe" in determining his RFC. SSR 96-8p, 1996 WL 374184, at *5. Arguably, therefore, the short duration of plaintiff's IBS and vertigo would not, *per se*, preclude RFC limitations caused by these conditions. The problem in this case is that the record does not support plaintiff's allegations of severe limitations arising from IBS and/or vertigo. His

IBS is well-controlled by Pregabalin which has the added benefit of not causing him drowsiness.  (See Tr. 427, 433, 440, 495).  His vertigo has resolved and thus no limitations are necessary.  Plaintiff points to his chiropractic care for pain in his back, feet, shoulders, and knee, as evidence that his RFC should include physical limitations. This contention is also unavailing in that there is no evidence that Dr. Anderson imposed any limitations on plaintiff's activities.  Plaintiff's testimony regarding his limitations will be addressed in conjunction with his challenge to the ALJ's credibility determination.

The ALJ's exclusion of physical limitations in the RFC formulation is supported by substantial evidence on the record and plaintiff's second allegation of error is denied.

### 3.    The ALJ's Treatment of Opinion Evidence

The ALJ stated that Nurse Carol Greening's treatment notes, "although kept by an unacceptable medical source," were approved by a doctor and thus entitled to "some weight."  The ALJ gave her medical source statement little weight because her findings were at odds with her own treatment notes.  Dr. Anderson's treatment notes were given little weight because he was "not an acceptable medical authority."  (Tr. 30-31).

The Social Security regulations separate information sources into two main groups: *acceptable medical sources* and *other sources*.  *Other sources* is further divided into two groups:  *medical sources* and *non-medical sources*.  20 C.F.R. §§ 404.1502, 416.902 (2007).  Chiropractors and nurse practitioners qualify as "other" medical sources.  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  "Other sources" cannot be relied upon to establish the existence of a medically determinable

-17-

impairment, but may provide evidence to show the severity of impairments and how they affect the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-3p, 2006 WL 2263437).

Plaintiff cannot show that giving Dr. Anderson's records greater weight would have altered the outcome. First, the records merely note the dates of office visits with a very brief statement of plaintiff's complaint and some indication of the treatment provided. The records do not include a diagnosis or indicate that Dr. Anderson imposed any restrictions on plaintiff's activities. Second, a review of the records from "acceptable medical sources" similarly does not show any diagnosis of, or treatment for, back or joint pain.

Even if Nurse Greening were an "acceptable medical source," her treatment notes would not support a finding that plaintiff is disabled: She consistently described plaintiff as alert, goal-oriented, stable or coping, with no evidence of a thought disorder, and displaying good judgment. According to her notes, plaintiff routinely denied depressive symptoms and, with few exceptions, his anxiety was well controlled. He appeared to have no difficulties tolerating his medications. As for Nurse Greening's opinion that plaintiff has marked limitations precluding work, the ALJ afforded the assessment little weight because the limitations she imposed were contrary to the observations she made in her treatment notes. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009); (citing Juszczyk v. Astrue, 542 F.3d 626, 632-33 (8th Cir. 2008)). Furthermore, despite stating that Nurse Greening's opinion was entitled to little weight, the ALJ found that

plaintiff was limited to occasional exposure to supervisors and the general public. This indicates that the ALJ gave some consideration to Nurse Greening's opinion.

Plaintiff has not established that the ALJ erred in assessing the weight to be afforded to the opinions of Nurse Carol Greening and Dr. Larry Anderson.

### 4.    The ALJ's Credibility Determination and Third-Party Reports

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the ALJ's RFC determination. (Tr. 29). The ALJ also gave little weight to reports from plaintiff's mother and sister, because their allegations "appear to be based in large part on [plaintiff's] subjective reports."

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ

may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)). The courts will defer to an ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (citation omitted).

As previously noted, the ALJ addressed the absence of objective evidence of disabling symptoms in the medical record. She also noted the discrepancy between plaintiff's activities of daily living and claims of disabling impairments: plaintiff reported in his function report that he cleans the house, does laundry, transports his children to and from school, and does yard work. He goes on bicycle rides and does grocery shopping. Activity that is inconsistent with an assertion of disability reflects negatively on a claimant's credibility. Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)). The ALJ also noted plaintiff's questionable compliance with Dr. Parikh's recommendations regarding diet and exercise, a factor that weighs against his credibility. See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005) (listing noncompliance as a factor in credibility analysis). Finally, the ALJ noted that plaintiff told his physicians throughout 2008 and 2009 that he was looking for work. (Tr. 336, 337, 438-39, 495). A plaintiff's search for employment during a claimed period of disability is a factor the ALJ can properly consider in determining credibility. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (listing factors supporting ALJ's credibility finding).

Plaintiff stated in his March 2009 Function Report that he did not feel like bathing or attending to his hygiene. Medical notes during this period never describe him as disheveled or presenting with poor hygiene. With respect to the Function Reports completed by plaintiff's mother and sister, there is no evidence in the record that plaintiff had a history of violent outbursts. The claim that plaintiff was socially isolated and unable to leave the house is refuted by his description of his activities. His medical providers routinely describe him as engaged and appropriate.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#15] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 5th day of July, 2012.